Filed 7/8/14  P. v. Vaughn CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARK EDWARD VAUGHN,<br><br>    Defendant and Appellant. | 2d Crim. No. B250071<br>(Super. Ct. No. VA124267)<br>(Los Angeles County) |

Mark Edward Vaughn appeals his conviction, by jury, of the second degree murder (Pen. Code, §§ 187, subd. (a), §189) of 17-month-old Jayden T., and of assault on a child causing death (§ 273ab, subd. (a)).  The trial court sentenced appellant to a term of 25 years to life in state prison on the assault conviction and stayed the term imposed for murder pursuant to section 654.[1]

Appellant contends the judgment is not supported by substantial evidence because there is no evidence he assaulted Jayden or otherwise caused her injuries.  He further contends the trial court erred because it failed to instruct the jury that a homicide committed by accident is excusable and because it failed to instruct the jury on the lesser included offense of involuntary manslaughter.

---

[1] All statutory references are to the Penal Code.

Finally, appellant contends he received ineffective assistance of counsel at trial because counsel failed to impeach the victim's mother and grandmother with their prior inconsistent statements, because counsel did not call any expert witnesses, and did not interview or call a percipient witness to his demeanor after Jayden was injured. We affirm.

*FACTS*

Appellant was the fiancé of Jayden's mother, Koryne. He is not Jayden's biological father. Koryne, then a nursing student, lived with her mother, Lisa, in Lisa's La Mirada home. On January 20, 2012, Koryne had an early class and Lisa had to work. Jayden's regular babysitters were not available, so appellant agreed to watch her until Koryne returned from class. He arrived at about 11:30 p.m. on the night before and stayed the night with Koryne.

On the morning of January 20, Koryne left the house at about 6:00 a.m. Lisa got up at about 6:30 a.m. She got ready for work and then woke Jayden. Lisa got Jayden ready for the day and fed her breakfast. By 8:15 a.m., appellant was awake and sitting on the couch with a lap top computer. He took Jayden from Lisa and Lisa left for work. Lisa testified that Jayden was clingy and crying when she left for work.

At about 10:20 a.m., appellant called 911, reporting that Jayden had fallen off a chair and was not breathing. Los Angeles County Sheriff's Deputy Patrick Unkle happened to be driving to his assignment at a nearby high school when he heard the dispatch. He arrived at the house about one minute later. Jayden was unresponsive, lying on her back, on the carpeted living room floor near a coffee table. Deputy Unkle asked appellant what happened. Appellant said the baby fell from the chair. When Deputy Unkle asked whether she hit her head on the table, appellant said he did not think so because it sounded like she hit the carpet. Jayden was not breathing. Deputy Unkle asked whether appellant had started CPR. He said "No," and that he was still talking to the 911 dispatcher. The deputy started CPR. He asked appellant to give Jayden breaths, while he gave her chest

2

compressions. Appellant gave two rescue breaths and then stood up and walked into the kitchen. He did not re-engage with Jayden while Deputy Unkle was present. Deputy Unkle continued to give Jayden CPR until paramedics arrived a few minutes later. He described appellant's demeanor during this period as "Extremely calm."

When the paramedics arrived at about 10:25 a.m., Jayden was in cardiac arrest and "ghost white." She was wearing only a diaper and felt cold to the touch. Her pupils were fixed and dilated. Paramedic Joel Entreken testified that he observed bruising behind both of Jayden's ears, which is indicative of a skull fracture. When he touched her head, he noticed "crepitus," or the "sensation of fracture bones grinding together." Appellant told the paramedic that Jayden fell off of the chair onto the carpeted floor and hit her head. He also said Jayden vomited while he was on the phone with 911. The paramedic described appellant's demeanor as "pretty emotionless . . . like he was just kind of a bystander." Another paramedic described the crepitus he observed on Jayden's head as the worst he had ever felt on a person.

Michael Mileki, a sergeant from the Los Angeles County Sheriff's Department, interviewed appellant at the house after Jayden was taken to the hospital. Appellant told Sgt. Mileki that he placed Jayden on a loveseat in the living room, turned on the TV so she could watch cartoons, and went into the kitchen to make breakfast for himself. While in the kitchen, he heard a "loud thud" and the sound of Jayden crying. It sounded to him as if Jayden had fallen off the couch. He immediately went to her. She was on her back with one foot propped up on the loveseat. Appellant said that he picked Jayden up and held her for about 30 minutes while she cried. Eventually, she started to become sleepy. He tried to keep her awake because he was not sure whether she had a concussion. She tried to close her eyes for about 15 minutes and then became unresponsive. At that point, appellant called 911. He did not start CPR because he thought she was still breathing. He put her on the floor and waited for the fire department to arrive.

3

Appellant seemed indifferent during the interview and seemed to feel "no sense of urgency" about the situation.

Jayden's aunt arrived at the house and confronted appellant about what had happened. He told the aunt that he was in the kitchen when he heard a "thump or like a thud." He went into the living room and found Jayden on her back with her leg propped up on the chair. She was crying and he picked her up to console her. She eventually calmed down, but then she became woozy and he called 911.

Detectives from the Sheriff's department inspected the area where appellant said Jayden fell. They found that Lisa's living room floor was constructed of a plywood subfloor over a concrete slab. The plywood was covered with padding and carpeting. Detectives found no blood, skin, or hair on either the coffee table or the floor. They returned to search the house on five occasions. Trace evidence of DNA was found on a piece of drywall they removed from a bathroom wall directly behind Jayden's potty chair. Aside from Jayden's injuries, there were no signs that a struggle had occurred in the house and the detectives found "no evidence of anything that was used a weapon."

On the day of the incident, Koryne asked appellant what happened. He told Koryne "that he had set the baby in a chair in our living room and went into the kitchen to make food, and he said he heard a thud and went into the living room and found the baby on her back with her foot up on the chair still." Jayden was crying so appellant picked her up and consoled her. They started playing. About 30 to 45 minutes later, Jayden started moaning and losing consciousness. Two weeks later, in early February 2012, Koryne asked appellant whether he put ice on Jayden's head. He told her that he did. She said, "'You didn't tell me that. Why didn't you tell me that?'" Appellant replied, "'I only told you 90 percent of what happened.'" Although Koryne asked appellant to tell her the other 10 percent, he refused.

4

Dr. Lawrence Nguyen, the medical examiner who performed the autopsy on Jayden, testified that he observed extensive hemorrhaging within her scalp and "severe complex skull fractures." There was a horizontal fracture that extended from the top of the skull all the way to the base of the skull. Other horizontal fracture lines emanated from that fracture. These fractures were caused by an external impact, rather than from internal pressure caused by brain swelling. Dr. Nguyen opined that Jayden must have suffered at least two strikes to her head.

Jayden also had bruising around her occipital scalp. Dr. Nguyen would not expect to see that bruising after a fall from 20 inches onto a carpeted, padded wooden floor. He would, instead, expect to see that level of bruising after a fall from a height of 10 feet or more. Dr. Nguyen observed a round bruise on Jayden's cheek that could have come from a hand or a thumb. In addition, the medical examiner observed an area of hemorrhage on her neck and trauma below her thyroid. These injuries are typically caused by a blow or by clutching of the neck.

Dr. Carol Berkowitz, an expert in pediatric emergency medicine and child abuse pediatrics, and the co-chair of the Child Death Review for Los Angeles County, reviewed the photographs and report of Jayden's autopsy. She opined that Jayden's injuries were not consistent with a fall from a chair onto a carpeted, padded, wood surface. Instead, her injuries were caused by an "inflicted severe blow to her head." It was not possible for her to say, to a medical certainty, how many blows were inflicted. However, Dr. Berkowitz believed the blows were inflicted by an object, rather than by a hand or a foot. A man of appellant's height and weight would be able to inflict these injuries "if he hit the child against a hard object like the wall or some other thing, but I believe it would have had to be contact with something hard, either something hard hitting the head or the head hitting something hard." Such a blow would not necessarily damage the wall or leave blood, hair or skin behind.

5

The fracture to Jayden's skull was so severe that it crossed the suture line, or the line that separates the different bones in the skull. A fall from a chair onto a carpeted surface could not generate sufficient velocity to cause that facture. To create an injury as severe as Jayden's, a child would have to fall "from probably two stories, or more than that . . . out of a window onto a concrete surface where the fall wasn't broken by any intervening items such as a tree or bushes, or it would occur with an ejection from a car where the child was thrown out of the car and, again, hit concrete."

Dr. Berkowitz did not believe Jayden would have cried after she received these injuries, as appellant described. She would, instead, have been immediately symptomatic because the injury was so massive.

Both experts acknowledged on cross-examination the existence of at least one other expert who found "that a fall of less than . . . three meters by a child can cause these kinds of complex injuries[.]" Doctors Nguyen and Berkowitz noted their disagreement with that expert. In addition, Dr. Berkowitz described a study of "death related to short falls in children, and short falls were one and a half meters[.]" The study concluded, "your chance of dying as a result of a short fall . . . was .48 in one million." The defense called no expert witnesses to rebut the testimony of Doctors Nguyen and Berkowitz.

Jayden's mother, Koryne, and grandmother, Lisa, described some minor injuries Jayden had sustained in the months prior to her death. One or two months before her death, Jayden hit the back of her head on the bathtub. She cried for a couple of minutes and had a bump on her head, but did not lose consciousness. Jayden also fell while running on a neighbor's driveway. She hit her nose and her hands but had no severe injuries. Finally, Jayden hit her head on a bed rail while she was staying at appellant's house several months before her death. Appellant explained to Lisa that Jayden was on the bed when he saw her start to roll off. He stuck his hand out, to catch her and, in doing so, shoved her into the bed rail.

6

Jayden hit her head, causing some bumps and bruises on her face. Koryne and Lisa took her to the doctor.

In his trial testimony, appellant said he loved Jayden. He denied hitting or bashing her head into a wall. Appellant testified that he put an ice pack on Jayden's head after her fall. She continued to cry. He took off her pajamas when it seemed like she was having trouble breathing. He tried to keep her awake because he thought she might have a concussion. Appellant did not tell the detectives about the ice pack because they did not ask him about it.

Appellant testified that he was Jayden's disciplinarian and "chief potty trainer." He corrected her by "saying 'no' or just talking to her[.]" On one occasion, appellant left Jayden on her potty for an hour because, he told detectives, "'I wanted her to go potty.'" After she did, they shared a big bowl of ice cream.

Appellant's father described him as being "soft spoken," with a "soft demeanor." Appellant had, his father believed, a "very loving relationship" with Jayden. One of appellant's friends described appellant as having "almost like a father-daughter relationship" with Jayden. The friend had never seen appellant involved in a physical fight and described him as not a violent person.

*PROCEDURAL HISTORY*

The jury found appellant guilty of murder (§ 187, subd. (a)) and assault on a child causing death (§ 273ab, subd. (a)). Appellant retained new counsel, obtained a 30-day continuance and filed a motion for new trial. Among other things, appellant contended in the motion for new trial that his defense counsel at trial was ineffective because counsel failed to call any expert witnesses in neurology, pathology or psychology. In support of the motion, appellant submitted the declarations of Dr. Charles Niesen, a pediatric neurologist, and Dr. Janice Ophoven, a pediatric pathologist. Dr. Niesen opined that Jayden's injuries could have been sustained in an accidental fall, especially if her head hit a hard surface like the wooden table that was present in Lisa's living room at the time. Dr. Ophoven opined that Jayden might have been conscious for a significant period of

7

time after sustaining the head injury and that the skull fracture could have been produced by even a short fall. Appellant also submitted the declaration of a forensic psychologist who opined that appellant "does not present with the characteristics associated with a proneness for violence; against children or adults."

The trial court denied the motion for new trial. It summarized the expert medical testimony indicating that Jayden suffered several traumatic injuries to the skull that could not have been caused by falling from a chair onto a carpeted floor. The trial court also mentioned appellant's testimony that he put ice on Jayden's head and noted, "no evidence of an ice pack was ever found either in the refrigerator or freezer . . . or in the vicinity of where the child was found when the 911 responders arrived." Referring to the autopsy photographs of Jayden's skull, the court stated: "I remember vividly the exhibits of the peeled-back skin, and the skull, and the fractures. It is so highly unlikely that a slight or small distance of 20 to 30 inches . . . the injuries were severe and could not have occurred as [appellant] has indicated, and the two experts who belatedly have submitted their declarations, it can be argued -- I've read the declarations-- it can be argued that counsel could have or should have called one or both or other experts, but the fact is counsel didn't, and I do not know because I have no evidence to that effect who it is, if any, experts were contacted by original counsel or the defendant and he intelligently and reasonably -- based on the standards that attorneys must exercise -- decided that it would not have been in his client's best interests to having done so. [¶] There is absolutely no basis in the court's opinion to grant the motion, and I'm going to proceed with the sentence."

## DISCUSSION

### Substantial Evidence

Appellant contends the judgment is not supported by substantial evidence because there is no evidence he caused Jayden's injuries. The contention is without merit.

8

"'"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence . . . that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . . The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. . . . "'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence . . ., it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. . . ."'" [Citation.]" (*People v. Tully* (2012) 54 Cal.4th 952, 1006-1007.)

The jury found that appellant committed murder (§ 187) and assault on a child causing death (§ 273ab). Murder is the unlawful killing of a human being with express or implied malice aforethought. Malice is express when the defendant manifests a deliberate intention unlawfully to kill a human being. It is implied when the killing results from an intentional act the natural consequences of which are dangerous to human life and the act was deliberately performed with knowledge of the danger to, and conscious disregard for, human life. (§§ 187, 188; *People v. Cook* (2006) 39 Cal.4th 566, 596.) A violation of section 273ab requires proof that the defendant had the care or custody of a child under eight years of age, the defendant committed an assault on the child, the assault was committed by means of force that to a reasonable person would be likely to produce great bodily injury, and the assault resulted in the death of the child. (*People v. Malfavon* (2002) 102 Cal.App.4th 727, 735.)

The record here contains substantial evidence that appellant committed both offenses. Appellant was alone with Jayden when she was injured.

9

Two medical experts testified that the severe complex skull fractures she sustained could not have been inflicted by the type of accidental fall appellant described. Instead, both expert witnesses opined the injuries were consistent with a very severe blow to the head inflicted by a hard object, such as by bashing Jayden's head into a wall. An injury this severe could not have been sustained in an accidental fall unless the fall was from a multi-story building onto a concrete surface. Additionally, Jayden sustained trauma below her thyroid, an injury that typically results from clutching the neck. The jury could have reasonably inferred, based on all of this evidence, that Jayden's injuries were caused by appellant's intentional conduct. It could further have reasonably inferred that appellant acted with express or implied malice when he hit the victim's head against a wall or other hard object with sufficient force to cause those severe skull fractures. Thus, there was substantial evidence to support both verdicts.

*Instructional Error*

Appellant contends the trial court prejudicially erred when it failed to instruct the jury that a homicide is excusable if it is committed by accident or misfortune and when it failed to instruct the jury on involuntary manslaughter as a lesser included offense of murder. We are not persuaded.

The trial court has a duty to instruct, sua sponte, on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case. (*People v. Boyer* (2006) 38 Cal.4th 412, 468-469.) This duty extends to defenses ""only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case."' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 424.) In this context, evidence is "'substantial' only if a reasonably jury could find it persuasive. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1200.)

The trial court's duty to instruct "'. . . has been held to include giving instructions on lesser included offenses when the evidence raises a question as to

10

whether all of the elements of the charged offense were present . . . but not when there is no evidence that the offense was less than that charged.  [Citations.]' . . ."  (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)  The trial court must instruct on all theories of the lesser included offense which find substantial support in the evidence, e.g., """evidence from which a jury composed of reasonable [persons] could . . . conclude[]"' that the lesser offense, but not the greater, was committed.  [Citations.]"  (*Id.* at p. 162.)

*Homicide by Accident or Misfortune*

Appellant contends the trial court erred when it failed to instruct the jury, "When a person commits an act or makes an omission through misfortune or by accident under circumstances that show [neither criminal intent nor purpose nor criminal negligence] he does not thereby commit a crime."  (CALJIC No. 4.45.)  In addition, appellant contends, the trial court should have instructed the jury that, "The unintentional killing of a human being is excusable and not unlawful when (1) committed by accident and misfortune in the performance of a lawful act by lawful means and (2) where the person causing the death acted with that care and caution which would be exercised by an ordinarily careful and prudent individual under like circumstances."  (CALJIC No. 5.00.)

The trial court declined to instruct the jury with either of these pattern instructions on the ground that there was no substantial evidence to support them.  Appellant contends the jury might have found he acted negligently when he left Jayden unattended and that she died after accidentally falling from the living room chair.  In addition, appellant contends, the jury might have found that Jayden's earlier accidental head injuries (e.g., from falling in the driveway or hitting her head in the bathtub) contributed to the severity of the injury she sustained in the accidental fall, causing her death.

This argument is without merit.  As the trial court correctly concluded, there was no substantial evidence supporting the theory that Jayden died as the result of an accident that occurred while appellant was performing a lawful

11

act with reasonable care, as required by CALJIC No. 5.00. The expert medical testimony was that Jayden's injuries were so extensive, they could not have been caused by an accidental fall from a living room chair. The same experts further testified there was no evidence of any "previous healing fracture[s]" on Jayden's skull. As a consequence, the evidence that Jayden may have hit her head in the bathtub or fell on a neighbor's driveway in the months or weeks prior to her death was not sufficient to warrant jury instructions on accidental death. Nor did appellant's testimony provide substantial evidentiary support for the accident instructions. Appellant claims that he placed the 17-month-old Jayden in a chair and then left her unattended for several minutes. There is no substantial evidence that this conduct was consistent with the "care and caution which would be exercised by an ordinarily careful and prudent individual under like circumstances." (CALJIC No. 5.00.)

*Involuntary Manslaughter as a Lesser Included Offense*

Appellant contends the trial court erred when it refused to instruct the jury on involuntary manslaughter as a lesser included offense of murder. He argues the jury could have found Jayden's skull fractures were caused by a misdemeanor battery or some form of criminally negligent conduct. We are not persuaded.

Involuntary manslaughter is a lesser related offense of assault on a child resulting in death, rather than a lesser included offense. (*Orlina v. Superior Court* (1999) 73 Cal.App.4th 258, 262.) "[A] defendant has no right to instructions on lesser-related offenses even if he requests the instruction and it would have been supported by substantial evidence. [Citation.]" (*People v. Valentine* (2006) 143 Cal.App.4th 1383, 1387.) Consequently, the trial court had no duty, sua sponte or otherwise, to instruct on involuntary manslaughter as an alternative to the assault charged here. (*People v. Stewart* (2000) 77 Cal.App.4th 785, 786.)

Involuntary manslaughter is, however, a lesser included offense of murder. (*People v. Abilez* (2007) 41 Cal.4th 472, 515.) "One commits involuntary manslaughter either by committing 'an unlawful act, not amounting to a felony' or

12

by committing 'a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.' [Citation.] If the evidence presents a material issue of whether a killing was committed without malice, and if there is substantial evidence the defendant committed involuntary manslaughter, failing to instruct on involuntary manslaughter would violate the defendant's constitutional right to have the jury determine every material issue. [Citation.]" (*People v. Cook*, *supra*, 39 Cal.4th at p. 596.)

There was no substantial evidence that Jayden's multiple, complex skull fractures were caused when appellant committed a misdemeanor battery, or when he committed some other "lawful act which might produce death" in a criminally negligent manner. (§ 192, subd. (b).) Instead, the expert medical testimony was that Jayden's skull fractured when her head was forcefully hit by, or slammed into a hard object such as a floor or a wall. Appellant's testimony was that no battery occurred at all. Neither scenario supports an instruction on involuntary manslaughter.

*Harmless Error*

Any error in the trial court's failure to instruct the jury on accident or on involuntary manslaughter was harmless because there is no reasonable probability appellant would have achieved a more favorable result had the instructions been given. (*People v. Breverman*, *supra*, 19 Cal.4th at p. 178; *People v. Russell* (2006) 144 Cal.App.4th 1415, 1431-1432.) When the jury found appellant guilty of violating section 273ab, it expressly found that appellant willfully assaulted Jayden "by means of force that to a reasonable person would be likely to produce great bodily injury," and that the assault resulted in her death. (§ 273ab, subd. (a); CALJIC No. 9.36.5.) The finding that appellant acted intentionally is inconsistent with the defense that Jayden's death was the result of an accident. (*People v. Jones* (1991) 234 Cal.App.3d 1303, 1314-1316.) Any error in the failure to instruct on involuntary manslaughter was harmless for the same reason. The jury's finding that appellant violated section 273ab necessarily includes

13

a finding that appellant acted with a higher degree of culpability than that required for involuntary manslaughter. The finding that appellant acted intentionally, rather than negligently, and with a degree of force exceeding that required to commit misdemeanor battery "precludes any possible error in the refusal to instruct on involuntary manslaughter. [Citation.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145.)

*Ineffective Assistance of Counsel*

Appellant contends his Sixth Amendment right to be represented by effective counsel at trial was violated because the conduct of his retained trial counsel fell below the applicable standard of care in several ways. Specifically, appellant contends his defense counsel at trial rendered ineffective assistance because trial counsel failed to (1) impeach the testimony of Jayden's mother with her prior inconsistent statements concerning the dates on which Jayden accidently hit her head in the bathtub and in a driveway fall; (2) call expert witnesses in neurology and pathology to counter the expert medical opinions offered by Doctors Nguyen and Berkowitz; (3) call a psychologist as an expert witness to testify that appellant's "nature" is not "consonant" with that of a child abuser; and (4) interview or call Anna Mena, a witness who would have testified that appellant was visibly upset, emotional and in extreme distress after Jayden was transported to the hospital.

"To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.) When a claim of ineffective assistance of counsel is raised on appeal, the appellant "must establish deficient performance based upon the four corners of

14

the record." (*Ibid.*) If the appellate record "fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal. [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069.) As a consequence, "claims of ineffective assistance are often more appropriately litigated in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

Here, the record on appeal does not show why appellant's trial counsel did not use the impeachment material or call the expert and percipient witnesses appellant highlights. We cannot adequately evaluate appellant's contentions in the absence of evidence explaining trial counsel's conduct or demonstrating his refusal to supply such an explanation. As our Supreme Court explained in *Mendoza Tello:* "An appellate court should not . . . [evaluate factual claims outside the record on appeal], set aside a jury verdict, and brand a defense attorney incompetent unless it can be truly confident all the relevant facts have been developed . . . ." (*People v. Mendoza Tello*, *supra*, 15 Cal.4th at p. 267.) We can have no such confidence here because the record on appeal contains no information about trial counsel's reasoning. At the same time, we cannot say there "simply could be no satisfactory explanation" for the choices trial counsel made. It may be the case that trial counsel was unable, after a reasonable search, to find expert witnesses willing to support the defense theory of the case, or that he made a reasoned tactical choice to avoid impeaching the testimony of a grieving mother.

Under these circumstances, we decline to consider appellant's ineffective assistance claim on its merits. The claim is more appropriately raised in a petition for writ of habeas corpus.[2] (*People v. Mendoza Tello*, *supra*, 15 Cal.4th at p. 267; *People v. Mayfield* (1993) 5 Cal.4th 142, 188.) For the same reason, we decline to consider appellant's contention that the cumulative effect of trial counsel's

---

[2] Appellant's petition for writ of habeas corpus (No. B254062) is pending and will be decided by separate order.

omissions was prejudicial and resulted in a denial of his Sixth Amendment right to effective assistance of counsel.

*DISPOSITION*

The judgment is affirmed.

NOT TO BE PUBLISHED.

BURKE, J.[*]

We concur:

GILBERT, P. J.

PERREN, J.

---

[*] (Judge of the Superior Court of San Luis Obispo County, assigned by the Chief Justice pursuant to art. 6, § 6 of the Cal. Const.)

16

C. Thomas I. McKnew, Jr., Judge

Superior Court County of Los Angeles

_____

James M. Crawford for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, Connie H. Kan, Deputy Attorney General, for Plaintiff and Respondent.